## MUTUAL LIFE INS CO. OF NEW YORK v. CITY NAT. BANK & TRUST CO. OF CHICAGO.

### No. 5820.

Circuit Court of Appeals, Seventh Circuit.

Dec. 10, 1936.

Frederick L. Allen, of New York City, and Silas H. Strawn, Harold A. Smith, and Gerard E. Grashorn, all of Chicago, Ill., for appellant.

C. D. Jones, of Chicago, Ill., for appellee.

Before SPARKS, Circuit Judge, and LINDLEY and BRIGGLE, District Judges.

BRIGGLE, District Judge.

This is an appeal from a judgment rendered in the District Court in favor of appellee (hereinafter called plaintiff) and against the Mutual Life Insurance Company of New York appellant (hereinafter called defendant), for the sum of $23,458.-31. The action was upon two life insurance contracts upon the life of Charles W. Myers, each in the face amount of $10,-000, with double indemnity provisions for accidental death in the following language: " * * * if there further be received at said Home Office due proof that such death resulted directly from bodily injury received after the date of issue of this Policy, independently and exclusively of all other causes, and that such bodily injury was effected solely through external, violent and accidental means, and that such death occurred within sixty days after the date of such bodily injury, promises to pay to said beneficiary instead of the face amount of this Policy, Twenty Thousand Dollars (Double the Face Amount of this Policy, herein called Double Indemnity) provided, however, that this Double Indemnity shall not be payable in the event of the Insured's death as a result * * * directly or indirectly from bodily or mental infirmity or disease of any sort. * * * "

The policies were originally payable to Sarah A. Myers, wife of the insured, as beneficiary, but later made payable to plaintiff as trustee under a certain trust agreement not now material. The face amount of each policy was paid by the insurer and the suit involved only that amount asserted to be due by virtue of the double indemnity provisions.

The principal issue of fact submitted to the jury was whether the insured had suffered an accidental death within the terms of the policy above set forth.

On the evening of September 3, 1930, about ten minutes after finishing his supper, Myers went to the bathroom of his home where he was seized with a fit of vomiting that lasted for five minutes. He was handed a glass of water by his wife, who then started to the kitchen for a brush. A few seconds later he fell to the bathroom floor, striking his dead on the radiator, causing an abrasion of the scalp and a consequent flow of blood, but no skull

fracture. He lay unconscious upon the floor and there died some 20 or 30 minutes later. His wife testified that she saw him reach for a towel and in so doing that he stepped upon a convex glass scale which tilted and threw him to the floor. No other witnesses were present, but doubt was cast upon the credibility of Mrs. Myers' testimony by the testimony of other witnesses that she had made conflicting statements to the effect that she was in the adjoining room or in the kitchen at the time he fell, and upon hearing the noise went to the bathroom.

There was introduced in evidence a photograph of the bathroom, showing a small floor scale with a platform and a protruding dial or indicator. In the photograph the scale is placed with the platform portion near the radiator and with the dial protruding into the room in the general direction of the washbasin. The dial portion appears to be covered with glass and undoubtedly is the portion referred to by Mrs. Myers when she says her husband, in reaching for a towel, stepped on the "convex glass scale." Mrs. Myers testifies that this photograph correctly portrays the location of the scale at the time in question.

It is apparent to only a casual observer of the photograph that if the scale was so located at the time in question it was in a most unserviceable position. One seeking to use it would either be required to step on the platform backwards and over the dial, or, after mounting the small platform, turn completely around in order that the dial, indicating the weight, would be visible. This physical fact also speaks against the credibility of this witness.

The deceased had been under the care of Dr. Liborio Figueroa for more than a year preceding his death, the doctor last seeing him professionally about two weeks before death. Dr. Figueroa had treated Myers for "chronic interstitial nephritis hypertension," and in the spring of 1929 had sent him to the hospital, where he had him under observation for some time and diagnosed his case as "chronic myocarditis, accompanied by decompensation." The day following the death of Mr. Myers, Dr. Figueroa executed a death certificate ascribing as the cause of death "chronic interstitial nephritis and hypertension" and as a secondary cause "chronic myocarditis." More than six months later, on March 10, 1931, he filed a supplemental report giving as an additional cause of death "shock due to fall against radiator in bathroom of home." A shadow was thus cast over the testimony of the attending physician.

There was much conflict in the testimony in other respects and much contrariety of opinion among the medical experts growing out of a post mortem examination some two months following death. Without a further discussion of the facts, it may be observed that the most favorable position that plaintiff can assert is that, in any event, the case presented a very close question of fact for the jury. This situation was keenly sensed by the trial judge in passing upon a motion for a new trial, as evidenced by the following remarks: "Well now, I will tell you, it is possible that had I been the trier of the facts in this case my conclusion might have been different from that of the jury, but I am not prepared to say that the verdict of the jury is against the manifest weight of the evidence. I am not prepared to say that, though I do say that it is possible that had I been the trier of the facts my finding would have been different from that of the jury. But unless we are going to eliminate the jury trial altogether, I have no right to set aside that verdict merely because my verdict, had I made one, would have been different from that of the jury, unless I further believe that that verdict is against the manifest weight of the evidence, and I can't say that it is."

■ Under such circumstances it was necessary that the record not only be free of substantial error but that counsel refrain from conduct that might reasonably be said to have prejudiced or inflamed the jury in their consideration of such fact questions. Assignments of error Nos. 2, 16, 17, 20, and 21 direct our attention to the conduct of counsel for plaintiff that is said to be prejudicial.

■ Assignment No. 2. In the cross-examination of Mrs. Myers she had identified a "certificate of death" filed by her with the Federal Life Insurance Company in which she had stated that deceased was in the bathroom alone and that she was in an adjoining room. On redirect examination the following occurred:

"Q. Now, Mrs. Myers, counsel showed you a piece of paper in which he stated it was a paper which you had signed to obtain money from the Federal Life Insurance Company, I believe. A. Yes.

"Q. And that is the paper that you stated that you did sign? A. Yes.

"Q. Did you receive that money? A. I did.

"Q. Was that on a policy similar to this?

"Mr. Smith: If your Honor please, I object as not redirect examination, as to whether the proceeds under that claim were ever paid.

"Mr. Jones: He brings out the question, your Honor.

"Mr. Smith: I ask that be stricken.

"Mr. Jones: I think we have a right to go into it.

"The Court: What is the question now, whether she received the money on that other policy?

"Mr. Jones: Yes, she stated she did. I am asking if that policy was a similar policy to this.

"Mr. Smith: I object and ask the answer be stricken.

"The Court: Sustained."

Assignment No. 16. A witness, Cold, a representative of the Republic Life Insurance Company, had testified concerning an interview with Mrs. Myers in regard to a policy held by decedent with that company. On cross-examination Mr. Jones for the plaintiff asked if he had made a report to his company, and upon the witness giving an affirmative answer the following transpired:

"Q. And they accepted that report, did they? A. They did.

"Q. Did you know that they later paid on their policy?

"Mr. Smith: I object, if your Honor please.

"The Court: Sustained."

Assignment No. 17. Immediately following, in the cross-examination of the witness Nelson the following transpired:

"Q. And you had a life insurance policy with a double indemnity feature for death by accidental means, did you not?

"Mr. Smith: I object, if your Honor please.

"The Court: Sustained.

"Mr. Jones: Q. You later paid on your policy, did you not?

"Mr. Smith: Now, if your Honor please—

"The Court: Don't pursue that question. * * *.

"The Court: The Jury are instructed to disregard the last interrogatory of counsel. It was improper for him to even ask it. Counsel is instructed not to repeat the interrogatory."

Assignments Nos. 20 and 21. In the closing argument of Mr. Smith, for defendant, he stated that he represented a Mutual Company and represented the other policyholders and was protecting the assets against unjust claims.

In the closing argument of Mr. Jones for plaintiff, the following transpired:

"Mr. Jones: Now, on behalf of these numerous policy holders of the Mutual Life Insurance Company of New York that he represents he asks you to bring in a verdict of not guilty.

"Well, did I ever hear of such a reason to bring in a verdict of not guilty, because there are other members of the Mutual Life Insurance Company of New York. Let me ask you, if their cases go the same way as this, what benefit have they got in the Mutual Life Insurance Company of New York if their assets are continually preserved as he would have you think that is his interest here. If they are always going to be preserved, why these members, these people that are members of that great company, the Mutual Life of New York, are going to get no benefit out of it either, when it comes time to pay their benefits, because the same principle will appear. If it appears now it will appear when anybody presents a claim.

"We can't pay you. We must conserve the assets of the Company.

"Now any of you who have seen a financial statement of that company, knows they have been pretty well preserved.

"Now, the idea of a lone woman here—

"Mr. Smith (Interrupting): Your Honor, I take exception to that remark of counsel. It is highly prejudicial and inflammatory and made for the purpose of prejudicing the jury in this case. * * *

"The Court: The objection is sustained.

"Mr. Jones: Well, there is nothing in the record of this case about the assets of this company, and he refers to it three different times.

"The Court: There was no objection to it.

"Gentlemen of the jury, the wealth or absence of wealth of the parties to this

proceeding makes no difference at all. You have a simple question here of whether or not the facts of this man's death brings that incident within the meaning of this policy. Whether the company is rich or poor, has much or little, makes no difference at all. Whether the plaintiff has much or little, whether she is a woman or man, or what she may be, has nothing to do with this case.

"Don't allow your minds to be distracted by that sort of thing.

"Make no further reference of that kind.

"(Further argument by Mr. Jones.)

"Well, if he is a professional witness, how about Doctor Mitchell sitting in the Court? Is that unethical and unfair? How about Doctor Fleming sitting at the end of the table? Two doctors there to write up trick questions.

"Mr. Smith: There was no Doctor Fleming sitting in court at the end of the table.

"Mr. Jones: Well, you know there was.

"Mr. Smith: I take exception to the remark of counsel.

"Mr. Jones: All right, I think that is going a little too far.

"The Court: Objection is sustained."

In each of the instances detailed, we think the conduct of counsel for plaintiff was unjustified, highly prejudicial, and calculated to inflame and bias the jury against the defendant insurance company. So far as the effect upon the jury was concerned, he may as well have adopted the much abused tactics of picturing "entrenched greed" arrayed against a "lone defenseless woman." Counsel does not now attempt to justify his conduct except to assert that in so far as his argument to the jury was concerned, it was provoked by the remarks of counsel for defendant. We are not to be understood as approving the statement of counsel for defendant that "he was representing other policy holders and was protecting the assets against unjust claims," but if defendant's counsel overstepped the bounds of propriety that was a matter to be called to the attention of the court; instead, however, plaintiff's counsel took the matter in his own hands and fairly outdistanced any impropriety of his adversary.

Courts are only interested that verdicts of juries shall speak the truth and any conduct on the part of counsel calculated to prejudice and inflame the human mind to the point of believing that some one is being abused or mistreated or unfairly dealt with is not conducive to such result.

The clear implication to be drawn from the questions propounded concerning accident policies in other companies was that other companies had accepted Mrs. Myers' proof of accident as sufficient upon which to recognize liability and that the defendant company was, therefore, unjustified and arbitrary in its denial of liability. The jury, of course, were not concerned with what other insurance companies had or had not done, and it was wrong to thus place the defendant in such light before the jury.

Whether misconduct of counsel in a given case is to be regarded as of sufficient importance to require a reversal depends wholly upon the circumstances of the case, and for that reason authorities are of little persuasion. Indeed, misconduct in one case might, under the circumstances of that case be regarded as affecting the verdict, whereas the same conduct under another set of circumstances, and in a case where the party's right to a verdict was clear and unmistakable, be overlooked.

That the District Court made such a valiant effort in this case to remove the evil injected therein by counsel in an effort to avert a mistrial is to be considered. It is to be noted that in each instance recited the court acted promptly and correctly instructed the jury that they should not give effect to the matters complained of, which under some circumstances would be deemed to have corrected the evil. We are persuaded, however, that under the circumstances of this case, where, as we believe, at the best, a close fact question was involved, it cannot be said that the jury were not, in spite of the court's admonitions, influenced by such unwarranted conduct of counsel. Nothing remained for the District Court to do that he did not do in an effort to mollify the evil, and the responsibility rests clearly upon the shoulders of plaintiff's counsel.

The judgment is, therefore, reversed and the cause remanded for new trial.

Reversed and remanded.